UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LUCIA PHARR HINTON,

    *Plaintiff*,

v.

CHEROKEE NATION, *et al.*,

    *Defendants*.

Civil Action No. 23-1422 (RDM)

**MEMORANDUM OPINION**

Plaintiff Lucia Pharr Hinton brings this action "individually and as a representative of the heirs" of her grandparents, Lumn W. Pharr and Bulah Pharr, to remedy wrongs that she alleges were committed by Defendants the Cherokee Nation, Principal Chief Chuck Hoskins, Jr., in his individual capacity, and Director of the Bureau of Indian Affairs ("BIA") Darryl LaCounte, in his individual capacity. Dkt. 2 at 1, 3–4 (Am. Compl. ¶¶ 8–11); Dkt. 16 at 1. The source of Plaintiff's claims is the Treaty of 1866, "a treaty entered into between the United States and the Cherokee Nation in the aftermath of the Civil War." *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 89–90 (D.D.C. 2017). In that treaty, the Cherokee Nation promised that "never here-after shall either slavery or involuntary servitude exist in their nation" and "all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees." Treaty With The Cherokee, 1866, U.S.–Cherokee Nation of Indians, art. 9, July 19, 1866, 14 Stat. 799 (hereinafter "Treaty of 1866" or "1866 Treaty"). The meaning of this commitment was recently the source of litigation before this Court.

1

In an action initiated by the Cherokee Nation against the U.S. Department of the Interior, the Secretary of the Interior, and a class of the "descendants of the original enrollees of the Dawes Commission Roll," the Court considered "whether the 1866 Treaty guarantees a continuing right to Cherokee Nation citizenship for the extant descendants of freedmen listed on the Final Roll of Cherokee Freedmen compiled by the United States Commission to the Five Civilized Tribes, also known as the 'Dawes Commission.'" *Nash*, 267 F. Supp. 3d at 90, 112.  In August 2017, the Court answered in the affirmative, determining that "[a]lthough the Cherokee Nation Constitution defines citizenship, Article 9 of the 1866 Treaty guarantees that the Cherokee Freedmen shall have the right to it for as long as native Cherokees have that right." *Id.* at 140.  To implement this judgment, the Court "enjoined" "[t]he Cherokee Nation and its officers and officials . . . from making descendants of Cherokee Freedmen ineligible for Cherokee citizenship or otherwise denying Cherokee citizenship for eligible Freedmen descendants." Order & J. at 2, *Cherokee Nation v. Nash*, No. 13-cv-1313 (D.D.C. Feb. 20, 2018), Dkt. 257.

Hinton, "as a descendant of Cherokee Freedmen," brings this case "to enforce the judgment that was rendered by" that decision.  Dkt. 2 at 1 (Am. Compl.).  In particular, she brings the following claims:  Against the Cherokee Nation, she alleges that the Nation violated the terms of the Treaty of 1866 and that the Nation has converted funds owed to her as a descendant of Cherokee Freedmen.[1]  *See Id.* at 5–7, 9 (Am. Compl. ¶¶ 15–27, 40–45).  Against Defendant LaCounte, she brings a claim under 42 U.S.C. § 1983 and a *Bivens* claim.  *See id.* at

---

[1] Although Principal Chief Hoskins is named as a defendant in this action, Hinton asserts no claim against him.  *See generally* Dkt. 2.  Accordingly, the Court will dismiss the complaint against Defendant Hoskins for a literal failure to state a claim.

2

7–9 (Am. Compl. ¶¶ 28–39). As a remedy, Plaintiff seeks $90,000,000 in damages. *Id.* at 10. She does not seek injunctive relief and has sued no government official in an official capacity.

Defendants Cherokee Nation and Hoskins have moved to dismiss the complaint, arguing that the Court lacks subject matter jurisdiction and that Plaintiff has failed to state a claim for relief. *See generally* Dkt. 16. Defendant LaCounte has also moved to dismiss the claims against himself, arguing that Plaintiff has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See generally* Dkt. 20. For the reasons that follow, the Court will **GRANT** both motions to dismiss and will dismiss all three claims against the Defendants.

## I. LEGAL STANDARD

Federal courts are courts of limited subject-matter jurisdiction that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack of subject-matter jurisdiction. When a defendant files a motion to dismiss for lack of subject-matter jurisdiction, the plaintiff ordinarily bears the burden of establishing jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). However, "a defendant claiming sovereign immunity in a motion to dismiss 'bears the burden of proving' they qualify for it." *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 796 (D.C. Cir. 2021) (quoting *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019)).

If the Court concludes that it has subject matter jurisdiction, it can consider whether the plaintiff has adequately stated a claim for relief under Federal Rule of Civil Procedure 12(b)(6). Such a motion is designed to "test[ ] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine

whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)) (alterations in original) (citation omitted). The plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

## II. ANALYSIS

A.  **Claims against the Cherokee Nation**

As noted above, Plaintiff brings two claims for damages against the Cherokee Nation, a claim that the tribe violated the terms of the Treaty of 1866 and a claim for conversion, Dkt. 2 at 5–7, 9 (Am. Compl. ¶¶ 15–27, 40–45). The Cherokee Nation, invoking its sovereign immunity, argues that the Court lacks subject matter jurisdiction over Hinton's claims against it. *See* Dk. 16-1 at 16–20. For the reasons that follow, the Court agrees that the tribe's sovereign immunity precludes Plaintiff's claims and will, accordingly, grant the Cherokee Nation's motion to dismiss.

Indian tribes are sovereign entities that "exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Georgia*, 5 Pet. 1, 17 (1841)). And "[a]s sovereigns, Indian tribes enjoy immunity against suits." *Vann v. Kempthorne*, 534 F.3d 741, 746 (D.C. Cir. 2008). This means that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *see also Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 928 (D.C. Cir. 2012) ("Because the Cherokee Nation is a sovereign

4

entity, it is entitled to sovereign immunity and may not be sued without its consent."). Plaintiff does not challenge the applicability of this general principle to the Cherokee Nation. Instead, she argues that the Nation is precluded from invoking its sovereign immunity in this suit because the tribe has waived its immunity through its prior litigation conduct, *see* Dkt. 25 at 10, and because an appropriations bill enacted by Congress on March 3, 1893 authorized her suit, *see id.* at 12. Neither argument is persuasive.

    1.    *Waiver through litigation conduct*

Plaintiff first argues that "this Court has jurisdiction, despite sovereign immunity, because the Defendant Indian tribe expressly waived its sovereign immunity . . . when it invoked this Court's jurisdiction" in *Cherokee Nation v. Nash*. Dkt. 25 at 10. Recall that in *Nash*, the Cherokee Nation filed suit in this Court to determine "whether the 1866 Treaty guarantees a continuing right to Cherokee Nation citizenship for the extant descendants of [certain] freedmen." *Nash*, 267 F. Supp. 3d at 90. There, the Cherokee Nation's sovereign immunity presented no barrier because the Cherokee Nation initiated the litigation pursuant to its enactment of tribal legislation that authorized its Attorney General to "pursue litigation" in federal court to "determine the narrow issue of construction of the 1866 Treaty language and any federal law affecting that treaty regarding federal rights, if any, of freedmen and their descendants." Tribal Council of the Cherokee Nation Res. No. 22-09 (Mar. 23, 2009).[2] Noting that a sovereign can waive its immunity by filing suit in federal court, Plaintiff contends that the Cherokee Nation's decision to initiate the *Nash* litigation waived the tribe's sovereign immunity

---

[2] The resolution specified that the litigation that was authorized and for which the tribe was waiving its immunity was "*Cherokee Nation v. Nash et al.*, Case No. 09-CV-052 (TCK) in the U.S. District Court for the Northern District of Oklahoma." *Id. Nash* was filed in that district court and was subsequently transferred to this Court. *Nash*, 267 F. Supp. 3d at 112–14.

5

with respect to any claim asserted against it under the 1866 Treaty.  *See* Dkt. at 25 at 10–11.  That argument, however, proves too much.

To be sure, the Supreme Court "has made clear in general that 'where a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment.'"  *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002) (quoting *Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284 (1906)) (emphasis omitted).  Thus, where a state removes an action filed in a state court to a federal forum, the state cannot then claim Eleventh Amendment immunity in the removed action.  *Id.*  But the same principle does not apply to Indian tribes.  The Supreme Court has held that when a tribe initiates a legal action, the tribe does not impliedly waive its sovereign immunity with respect to any counterclaim that the defendant in that tribe-initiated-action may bring.

In *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505 (1991), the Court rejected the argument that the State of Oklahoma could countersue a tribe that had initially sued the state, explaining that "a tribe does not waive its sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim to an action filed by the tribe."  *Id.* at 509; *see also id.* ("Possessing . . . immunity from direct suit, we are of the opinion [the Indian nations] possess a similar immunity from cross-suits." (quoting *United States v. U.S. Fidelity & Guaranty Co.*, 309 U.S. 506, 513 (1940))); *Lapides*, 535 U.S. at 623 (distinguishing the case before it concerning Eleventh Amendment immunity from its prior cases in which the United States and tribes were "permitted . . . to enter into a case voluntarily without giving up immunity or to assert immunity despite a previous effort to waive").  There, the tribe had filed suit in federal court to

enjoin the state's enforcement of a tax assessment against the tribe. The state countersued, asking the federal court to enforce its tax assessment. *Okla. Tax Comm'n*, 498 U.S. at 507. The Supreme Court held that the tribe's decision to file suit in the first instance did not prevent the tribe from invoking its sovereign immunity as a defense to the state's counterclaim. *Id.* at 509.

Plaintiff's claim in this case is, if anything, even less justified than the counterclaim in *Oklahoma Tax Commission*. In *Nash*, the Cherokee Nation initiated litigation to "determine the narrow issue of construction of the 1866 Treaty language and any federal law affecting that treaty regarding federal rights, if any, of freedmen and their descendants," Tribal Council of the Cherokee Nation Res. No. 22-09 (Mar. 23, 2009), the result of which was injunctive relief entered against the tribe, Order & J. at 2, *Cherokee Nation v. Nash*, No. 13-cv-1313 (D.D.C. Feb. 20, 2018), Dkt. 257. Hinton now brings this suit against the Cherokee Nation, claiming that the Nation has violated the obligations it owes to her, as a descendant of Freedmen, pursuant to the 1866 Treaty and seeking compensatory damages for that breach. If Plaintiff could not assert this counterclaim in *Nash* itself, there is no reason to conclude that Plaintiff can do so here, in a separate action for monetary relief. A long line of cases makes clear that a tribe's initiation of a federal lawsuit on one subject matter does not operate as a waiver of the tribe's sovereign immunity with respect to a counterclaim on the same subject, *see Okla. Tax Comm'n*, 498 U.S. at 507, much less a waiver of future claims seeking an entirely different form of relief.[3] *See*

---

[3] The Court recognizes that there has been discussion in recent years about whether a tribe's sovereign immunity extends to *in rem* actions against tribal property that are brought by a state or local government to collect taxes owed on that property. *See Oneida Indian Nation of New York v. Madison Cnty., Oneida Cnty., N.Y.*, 605 F.3d 149, 156 (2d Cir. 2010) (discussing the impact of *City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005), on such *in rem* foreclosure actions), *vacated and remanded sub nom. Madison Cnty., N.Y. v. Oneida Indian Nation of N.Y.*, 562 U.S. 42 (2011). There is no challenge, however, to the longstanding principle that in an *in personam* action, a tribe is immune from counterclaims, unless the tribe

*Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 773–74 (D.C. Cir. 1986) ("A tribe does not automatically open itself up to counterclaims simply by virtue of filing a suit. An Indian tribe's immunity is co-extensive with the United States' immunity, and neither loses that immunity by instituting an action, even when the defendant files a compulsory counterclaim."); *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1009 (10th Cir. 2015) (Gorsuch, J.) ("It's long since settled that an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. This principle extends to counterclaims lodged against a plaintiff tribe—even compulsory counterclaims." (internal quotation marks and citations omitted)); *Quinault Indian Nation v. Pearson for Est. of Comenout*, 868 F.3d 1093, 1097 (9th Cir. 2017) ("Tribal immunity even extends to compulsory counterclaims in excess of the original claims—despite the fact that compulsory counterclaims by definition arise out of the same transaction or occurrence. On this point, Supreme Court precedent couldn't be clearer: a tribe's decision to go to court doesn't automatically open it up to counterclaims." (internal quotation marks and citations omitted)); *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001) ("[T]o relinquish its immunity, a tribe's waiver must be clear.") (internal quotation marks omitted); *see, e.g.*, *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 120 (D.D.C. 2022) (dismissing a party's counterclaims against a tribe, finding that the tribe's initiation of the suit did not impliedly waive the tribe's immunity with respect to counterclaims).

---

has unequivocally waived its immunity. Hinton's suit against the Cherokee Nation is an *in personam* action.

8

2. *Congressional abrogation*

Plaintiff next argues that she can sue the Cherokee Nation, notwithstanding its sovereign immunity, because an appropriations bill enacted by Congress on March 3, 1893, abrogated the tribe's immunity. Dkt. 25 at 12; *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, (1978) (explaining that a tribe's sovereign immunity "is subject to the superior and plenary control of Congress"); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 387 (2023) ("To abrogate sovereign immunity, Congress must make its intent unmistakably clear in the language of the statute." (internal quotation marks and alterations omitted)). For support, Plaintiff cites to *Nash*, which described the relevant legislative enactment as follows:

> The March 3, 1893 appropriations act also stated in relevant part that, of the appropriated funds being paid for the Cherokee Outlet, "a sufficient amount shall also be retained in the Treasury to pay the freedmen who are citizens of the Cherokee Nation[ ] or their legal heirs and representatives such sums as may be determined by the courts of the United States to be due them" and "[n]or shall anything herein be held to abridge or deny to said freedmen any rights to which they may be entitled under existing laws or treaties."

*Nash*, 267 F. Supp. 3d at 106. According to Plaintiff, through "the clear language" of this appropriations bill, "Congress waived sovereign immunity and gave this Court the authority to determine the sums due to the Plaintiff[] and her freedmen's descendants." Dkt. 25 at 12.

But Plaintiff's reliance on this century-old law is misplaced. To begin, the scheme that it sets up is one that is based in the Court of Claims—now the U.S. Court of Federal Claims—not this Court. For another, Plaintiff does not seek to bring the type of claim for compensation that this scheme encompassed. As the Court explained in *Nash*, "[i]n 1890, as the United States continued seeking to induce the Cherokee Nation to surrender its lands and controversy lingered about the rights of freedmen to the proceeds of those lands, Congress enacted a law conferring

9

jurisdiction on the Court of Claims 'to hear and determine what are the just rights in law or in equity . . . of the Cherokee freedmen, who are settled and located in the Cherokee Nation under the provisions and stipulations of article nine of the . . . treaty of eighteen hundred and sixty-six.'" 267 F. Supp. 3d at 106 (quoting Interior's Mot. for Summ. J. Ex. 17, Act to Refer to the Court of Claims Certain Claims of the Shawnee and Delaware Indians and the freedmen of the Cherokee Nation, and for Other Purposes, § 1, 26 Stat. 636, 636 (Oct. 1, 1890), ECF No. 234–17).  The appropriations act that Plaintiff cites was part of this scheme, pursuant to which the Court of Claims could determine whether an individual had a claim to funds paid to the Cherokee Nation in exchange for land ceded to the federal government.  Plaintiff articulates no claim that she is entitled to any particular distribution of funds from the Nation's conveyance of land to the federal government over a hundred years ago; her claim for compensation is centered on her alleged loss of "the use or deed of land, monthly stipends, health coverage benefits" "from 2007 to present."  Dkt. 2 at 6 (Am. Compl. ¶¶ 21, 24).  Accordingly, even assuming that the 1893 appropriations act constituted a limited abrogation of the Cherokee Nation's sovereign immunity, Plaintiff's claims in this case would not fall within that abrogation.

    3.    *Ex parte Young*

There is a third path by which a plaintiff may ordinarily sue a sovereign entity otherwise protected by immunity.  To avoid the sovereign immunity bar, a plaintiff may sue the relevant executive official in his or her official capacity.  *See Ex parte Young*, 209 U.S. 123 (1908).  "Under Supreme Court precedent, that is the standard approach by which a party may obtain declaratory or injunctive relief with respect to a sovereign entity notwithstanding sovereign immunity."  *Vann*, 701 F.3d at 928.  Hinton, however, has not sued any executive official of the

Cherokee Nation in an official capacity—and she does not seek declaratory or injunctive relief. She seeks monetary damages, for which the *Ex parte Young* avenue is unavailable.

* * *

For the foregoing reasons, the Court concludes that Plaintiff's claims against the Cherokee Nation are barred by the tribe's sovereign immunity. Accordingly, the Court will grant the Cherokee Nation's motion to dismiss the complaint and will dismiss the claims against the Nation.

**B.     Claim against LaCounte**

Plaintiff also asserts a separate claim against LaCounte, the Director of the BIA, in his individual capacity. That claim, which she stylizes both as a claim under 42 U.S.C. § 1983 as well as a *Bivens* claim, *see Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 395–97 (1971), alleges that LaCounte "violated Plaintiff[']s rights under the color of federal law," Dkt. 2 at 7 (Am. Compl. ¶ 33), and seeks damages in the amount of $90,000,000, *id.* at 9 (Am. Compl. ¶ 39). Because "Section 1983 does not apply to federal officials acting under color of federal law," *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005), the Court will consider Plaintiff's claim against LaCounte solely as a *Bivens* claim.

To state a *Bivens* claim, a plaintiff must at least allege that: (1) she was "deprived of a right secured by the Constitution or laws of the United States," *Lewis v. Bayh*, 577 F. Supp. 2d 47, 57 (D.D.C. 2008); (2) the right was clearly established, *see Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009); (3) the defendant was a federal actor by virtue of acting under color of federal law, *see CHS Indus., LLC v. U.S. Customs & Border Prot.*, 653 F. Supp. 2d 50, 55 (D.D.C. 2009); and (4) the defendant was personally involved in the alleged

violation, *see Patterson v. United States*, 999 F. Supp. 2d 300, 308 (D.D.C. 2013). Hinton argues that she has met this minimal burden. *See* Dkt. 26 at 5–6. The Court is unpersuaded.

Although Plaintiff alleges that her constitutional rights were violated, *see* Dkt. 2 at 8 (Am. Compl. ¶ 35a) (alleging that LaCounte "[v]iolated the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution by ensuring that non-white descendants of the Cherokee Nation received the economic benefits emanating directly or indirectly from the Treaty of 1866 but failing to protect the rights of" Plaintiff); *id.* (Am. Compl. ¶ 35c) (alleging that LaCounte "[v]iolated the substantive and procedural due process clause of the United States Constitution"), she fails to explain, in nonconclusory terms, how those rights were violated.[4] Plaintiff's theory appears to be that she is owed economic benefits flowing to her as "a descendant of Cherokee Freedmen" under the 1866 Treaty, *id.* at 1; that LaCounte, as BIA Director, is "responsible for ensuring" that the Cherokee Nation "fairly and administratively abide[s] by the Treaty of 1866," *id.* at 7 (Am. Compl. ¶ 32); and that LaCounte's failure to do so (at some indeterminant time) resulted in the aforementioned constitutional violations. But this skeletal set of allegations falls short of what is necessary to state a claim for relief. Her complaint does not, for example, include any allegations that explain why the Privilege and Immunities Clause has been violated by LaCounte's failure to oversee the Cherokee Nation's compliance with 1866 Treaty or that explain how her injury is related to that alleged

---

[4] The Court notes in this regard that Hinton is not claiming that any statutory rights of hers were violated. To the contrary, in her opposition to LaCounte's motion to dismiss, Hinton states that she is "seeking to maintain a *Bivens* action, that is, an implied cause of action for damages because of constitutional violations by federal government officials." Dkt. 26 at 5; *id.* at 5–6 ("Plaintiff made the following allegations: Plaintiff[] alleged that Defendant violated the Privileges and Immunities Clause of Article 5 by ensuring that non-white descendants received the economic benefits emanating from the Treaty of 1866 and that he violated several other constitutional rights enjoyed by the Plaintiff[].").

constitutional violation.  A complaint that contains only legal conclusions disguised as factual allegations, "'naked assertions' devoid of 'further factual enhancement,'" or a "'formulaic recitation of the elements of a cause of action'" is insufficient to survive a motion to dismiss for a failure to state a claim.  *Sevier v. Lowenthal*, 302 F. Supp. 3d 312, 317 (D.D.C. 2018) (quoting *Iqbal*, 556 U.S. at 678 (2009)).  Here, Plaintiff has alleged facts parroting the legal elements of a *Bivens* claim; she had failed to allege with sufficient specificity any facts that make plausible the constitutional violations she alleges.

In addition, Plaintiff's complaint fails to allege that LaCounte was personally involved in the alleged constitutional violations.  "For a *Bivens* claim to survive a motion to dismiss, '[t]he complaint must at least allege that the defendant federal official was personally involved in the illegal conduct.'"  *Garcia v. Sebelius*, 867 F. Supp. 2d 125, 137–38 (D.D.C. 2012), *opinion vacated in part on different grounds*, 919 F. Supp. 2d 43 (D.D.C. 2013) (quoting *Simpkins v. District of Columbia*, 108 F.3d 366, 369 (D.C. Cir. 1997)).  Here, Plaintiff alleges that it was LaCounte's responsibility, as the leader of the "government agency responsible for administering the treaties and laws between the United States government and the Cherokee Nation," Dkt. 2 at 4 (Am. Compl. ¶ 11), to ensure that the Cherokee Nation complied with the Treaty of 1866.  *See also id.* at 7 (Am. Compl. ¶ 32).  She does not, however, allege that LaCounte was in any way personally involved in the administration of this treaty or in the alleged constitutional violations against Plaintiff.

Moreover, to the extent that is Hinton maintains that LaCounte is liable because he led the agency that oversaw the administration of the 1866 Treaty, that theory fails to state a claim.  Such a theory relies on respondeat superior or vicarious liability to implicate LaCounte, and it is well established that "vicarious liability is inapplicable to *Bivens* and § 1983 suits." *Iqbal*, 556

13

U.S. at 676; *see also Risley v. Hawk*, 108 F.3d 1396, 1396 (D.C. Cir. 1997) (per curiam); *Qian Ibrahim Zhao v. Unknown Agent of CIA*, 411 Fed. App'x. 336, 336 (D.C. Cir. 2010) (per curiam) ("Appellant failed to state a claim under *Bivens* . . . against the Secretary of the Department of Homeland Security because he did not allege that the Secretary, through her 'own individual actions, has violated the Constitution.'" (quoting *Iqbal*, 556 U.S. at 676)).

Because Plaintiff has failed to allege, as she must, that LaCounte, "through [his] own individual actions, has violated the Constitution," *Iqbal*, 556 U.S. at 676, and because Plaintiff has not alleged with adequate specificity a constitutional violation, the Court finds that Hinton has failed to state a claim for relief under *Bivens*.[5]  The Court will therefore dismiss the claim against Defendant LaCounte in his individual capacity.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants Cherokee Nation and Hoskins' motion to dismiss, Dkt. 16.  The Court will further **GRANT** Defendant LaCounte's motion to dismiss, Dkt. 20.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 16, 2024

---

[5] Because the Court finds that Plaintiff has not stated a claim for relief under *Bivens*, the Court need not consider Defendant LaCounte's alternative argument that Plaintiff's *Bivens* claim fails because it presents a new context and special factors warrant against expanding *Bivens* to that context.  *See* Dkt. 20 at 12–20.